

1  Jenny L. Dixon (SBN 192638)
   HAHN LOESER & PARKS LLP
2  600 W. Broadway, Suite 1500
   San Diego, California 92101
3  Telephone: (619) 810-4300
   Facsimile: (619) 810-4301
4  Email: jldixon@hahnlaw.com

5  Channing Blair Hesse (*pro hac vice forthcoming*)
   Spencer Lee Davidson (*pro hac vice forthcoming*)
6  GROGAN HESSE & UDITSKY, P.C.
   2 Mid America Plaza, Ste. 110
7  Oakbrook Terrace, IL 60181
   Telephone: (630)833-5533
8  Email: chesse@ghulaw.com
   Email: sdavidson@ghulaw.com
9
   Attorneys for Plaintiff Autumn Cambron
10

11              **UNITED STATES DISTRICT COURT**

12            **SOUTHERN DISTRICT OF CALIFORNIA**

13  AUTUMN CAMBRON,                    **Case No.**  '24CV2498 CAB VET

14              *Plaintiff,*

15      vs.                           **JURY DEMANDED**

16                                     **COMPLAINT**
    SCALE SOCIAL, INC. and RALPH D.
17  GRAMAJO
                *Defendants.*
18

19

20

21

22

23

24

25

26

27

28

*(left margin, vertical text)* Hahn Loeser & Parks, LLP · One America Plaza · 600 W. Broadway, Suite 1500 · San Diego, CA 92101 · Tel: (619) 810-4300 · Fax: (619) 810-4301

COMPLAINT

18279933.

**INTRODUCTION**

1.      This action arises from Defendants' deceptive, predatory, and illegal business practices.  Defendants used false and misleading statements to lure a 20-year-old female model into signing an illegal contract in violation of California's Talent Agencies Act.  Defendants' actions not only reduced Plaintiff's income, despite promises to the contrary, but further violated their own illegal contract by taking more than the 60% share allotted to Defendants.

**THE PARTIES**

2.      Plaintiff Autumn Cambron ("**Cambron**") is a resident of the state of Kentucky.

3.      Defendant Scale Social, Inc. ("**Scale Social**") is a corporation organized under the laws of California and has a principal place of business at 1604 Pacific Beach Drive, San Diego, California 92109.

4.      Defendant Ralph D. Gramajo ("**Gramajo**") is a resident of the state of Arizona.

5.      Based on information and belief, Gramajo is the sole shareholder of Scale Social.

6.      Gramajo is, and at all relevant times was, the sole officer and director of Scale Social.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

1
COMPLAINT

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the instant amount in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

8.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as one claim asserted herein arises under federal law, and the Court has supplemental jurisdiction over all other claims asserted herein under 28 U.S.C. § 1367, as all other said claims form part of the same case or controversy.

9.     This Court has personal jurisdiction over Plaintiff because she consents to the Court's jurisdiction.

10.     This Court has personal jurisdiction over Defendants because they transact and conduct business and have violated statutory and common law in the state of California and this District.

11.     Venue is proper in this Court under the governing law provision of the contract executed between the parties (the "Contract"), which states that "[a]ll legal actions relating to this Agreement shall be brought in the state or federal courts located in the State of California. Each party knowingly and voluntarily agrees to San Diego, California as the venue for any such action, suit, or proceeding." (**Exhibit A**, the Contract, § 19.1).

## ALLEGATIONS COMMON TO ALL CLAIMS
### Relevant Background

12.    Cambron is a model who works in the social media industry. She creates digital content, which primarily consists of photographs and videos, and posts it on her various social media accounts, including platforms such as Instagram, X (formerly Twitter), OnlyFans, and TikTok.

13.    OnlyFans is an online social media platform and application. It operates similarly to any other social media platform whereby users create and post content, and other users can subscribe to view the content. However, unlike most other social media platforms, OnlyFans is more commercial in nature.

14.    OnlyFans users can be generally categorized into two types, "creators" and "fans." OnlyFans defines a "**Creator**" as "a User[1] who has set up their OnlyFans account to post Content for Fans to view," and a "**Fan**" as "a User who has registered for an account and who can access a Creator's Content via a Creator Interaction." (**Exhibit B**, OnlyFans Agreement Between Fan and Creator).

15.    Practically speaking, Creators are the artists who produce the content published on OnlyFans, while Fans are the consumers.

16.    Creators can charge Fans to view the Creator's content. Fans can pay a monthly subscription to the Creator, or Creators may sell their content in an à la carte fashion, where a Fan purchases only selected content from the Creator.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

---

[1] OnlyFans defines a "**User**" as "any user of OnlyFans, whether a Creator or a Fan or both." (Ex. B.)

3
COMPLAINT

18279933.

17.    Cambron is a Creator and has been producing and publishing content on OnlyFans for several years.

18.    Creators, like models, athletes, and actresses who work in the entertainment and performance industry, typically hire talent managers.

19.    Sometime in the fall of 2022, Gramajo contacted Cambron's then-manager about working with him (Gramajo) to start a new OnlyFans account for Cambron. In doing so, Gramajo represented to Cambron that he had worked with several other successful Creators and had helped them grow their followings and increase their revenues.

20.    Gramajo even showed Cambron various financial statements from those other Creators who he claimed to have worked with—taking credit for those Creators' financial performances—and represented to Cambron that he could do the same for her.

21.    However, Gramajo did not work with those other Creators for which he showed the financial statements to Cambron. Instead, Gramajo showed Cambron results that were achieved by other OnlyFans managers, misrepresenting the results to Cambron as his own.

22.    Unfortunately, Cambron did not learn of Gramajo's fraudulent misrepresentations until after she had executed the Contract.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA  92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

18279933.

**The Contract and New Account**

23.     On September 10, 2022, in reliance on the representations made by Gramajo, including those regarding his role in generating the exceptional financial performance of the other Creators, Cambron executed the Contract with Defendants.

24.     After the Contract was executed, Defendants created a new OnlyFans account for Cambron (the "**New Account**").

25.     Defendants were also given access to Cambron's other social media accounts, including Cambron's previously established OnlyFans account (the "**Original Account**").

26.     OnlyFans has certain identity verification measures in place that are required to open a new account, which require the user to send a photograph holding a valid form of identification. So, to create the New Account, Defendants required and instructed Cambron to send a photo of herself holding her driver's license. Defendants also created and controlled an email address on behalf of Cambron, which Defendants used to register the New Account. Defendants sent the photo of Cambron with her driver's license to OnlyFans.

27.     Defendants consistently kept Cambron locked out of the New Account and the Original Account by changing the accounts' passwords and refusing to give her the passwords, despite repeated requests for the same. On the occasion Defendants would give Cambron the passwords, Defendants would soon thereafter change them,

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA  92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

thereby, again, locking Cambron out of her own accounts for indefinite periods of time.

28.    Furthermore, Defendants linked Gramajo's personal bank account to the New Account instead of Cambron's, and thus, Gramajo received all revenue generated from the New Account during the time his account was linked.

29.    On numerous occasions, Cambron requested that Defendants link her bank account to the New Account, to no avail. Ultimately, Cambron was forced to reach out to OnlyFans to get assistance with removing Gramajo from the New Account.

### Defendants' Acts Went Far Beyond "Marketing" Services

30.    The Contract is entitled "Marketing Agreement," when, in reality, it was anything but. For Gramajo, the Contract was an opportunity to control, coerce, steal from, and take advantage of Cambron.

31.    On multiple occasions, Gramajo directed Cambron to travel across the county, and sometimes out of the country, for engagements to create content for the New Account, Defendants' social media accounts, and other Creators' social media accounts, the latter of which Defendants managed and controlled.

32.    For example, on or about December 6 through December 9 of 2022, Defendants directed Cambron to travel to Phoenix, Arizona, where Defendants had rented a house for Gramajo, Cambron, and other Creators to stay at and create content. Defendants hired a professional photographer to take photos of Cambron for content,

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

which was to be used for the New Account. Originally, Gramajo represented to Cambron that the photo shoot was for her and some of the other Creators (all young females); however, Gramajo inserted himself and took part in the photo shoot. Gramajo later used the photos from the shoot—including photos that he was and was not in—for his personal social media accounts. Cambron did not consent to Gramajo using these photos for his social media accounts.

33.    On another occasion, on or about January 25 through January 30, 2023, Defendants directed Cambron to fly to Mexico, where Defendants had rented a house. Three other Creators (all young females), who Defendants managed, were also present. While in Mexico, Gramajo offered and attempted to procure engagements for Cambron by creating content with him for Gramajo's OnlyFans account, the New Account, and the other Creators' OnlyFans accounts. Gramajo also offered and attempted to procure engagements for Cambron by creating content with the other Creators, which would be used for Defendants' OnlyFans account, the New Account, and the other Creators' OnlyFans accounts.

34.    Furthermore, while in Mexico, Defendants again hired a professional photographer for Cambron and the other Creators. Again, Gramajo inserted himself in the photo shoot, taking photos with Cambron and Cambron and the other Creators. Gramajo also had Cambron take photos with the other Creators. The purpose of the photoshoot was to create content for Gramajo's account, the New Account, and the other Creators' accounts. Gramajo later used photos from the shoot, which contained

18279933.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

himself and Cambron, for his own social media accounts. Cambron did not consent to Gramajo using the photos for his social media accounts.

35.    Gramajo also tagged[2] himself in content created and posted by Cambron that he was not in. For example, Cambron posted a video containing her and her boyfriend on the New Account, and Gramajo tagged himself as Cambron's boyfriend, thereby directing traffic to Gramajo's OnlyFans account, which would help Gramajo benefit financially from Cambron's content. Cambron did not consent to Gramajo tagging himself in any of her content, falsely representing himself as her boyfriend, or using the content for a commercial purpose.

36.    Defendants ordered and instructed Cambron to create certain types of content. For example, Gramajo instructed Cambron to create certain types of videos and to go live[3] on OnlyFans at least three times per week.

### Defendants Had Cambron Recruit Other Creators

37.    Defendants also instructed Cambron to help them procure management contracts with additional Creators for which Cambron received no compensation.

38.    Defendants then asked Cambron to create content with these other Creators managed by Defendants, which Defendants then used for their own social media accounts and the other Creators' social media accounts.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

---

[2] To "tag" someone in a social media post means to mention or link one's social media profile within the post, which usually makes the post visible to the tagged individual's network and often implies that the tagged individual is the person shown in the post.
[3] "Going live" on social media means broadcasting real-time video so your followers/subscribers can watch, interact, and comment as the live stream occurs.

COMPLAINT
18279933.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

39.     Defendants would include Cambron on FaceTime and phone calls and have her attend dinners with other Creators who Defendants were attempting to recruit, further attempting to procure management contracts for themselves.

40.     Defendants even provided Cambron with a template message and instructed her to use it to recruit other Creators.

41.     Cambron was never compensated for her efforts in recruiting other Creators.

**Defendants Failed to Deliver Under the Contract**

42.     The New Account did not financially perform nearly as well as Defendants had represented.

43.     When Gramajo solicited Cambron to execute the Contract, he promised Cambron the New Account would generate $80,000 in monthly revenue. In actuality, the account, on average, generated half of that.

44.     On or about December 23, 2022, Cambron texted Gramajo asking why the New Account was not performing as well as he initially promised it would. In response, Gramajo stated, "I'm working on a way to get you more promo." "More promo" referred to more engagements with other Creators, and likely himself, to create more content to get more paying subscribers.

45.     On several other occasions, including on or about February 20 and 27, 2023, and March 8, 2023, Cambron again texted Gramajo regarding the New

COMPLAINT
18279933.

Account's significant underperformance. Every time, Gramajo ignored Cambron's concern.

46.     The New Account never generated the income Gramajo promised it would.

47.     Under the Contract, Defendants were to be compensated by receiving sixty percent (60%) of Cambron's net profits generated from her OnlyFans accounts and "any other social media." (Ex. A § 3.1.) The remaining forty percent (40%) would be paid to Cambron.

48.     In 2022, the New Account generated $248,569.01 in net revenue.

49.     Forty percent (40%) of $248,569.01 is $99,427.60; however, Defendants paid Cambron just $57,633.60, meaning Defendants wrongfully withheld $41,794.00 from Cambron, thereby taking over sixty percent (60%) of the net profits generated from the New Account.

## FIRST CLAIM FOR RELIEF

### Declaratory Judgment

50.     Cambron hereby incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

51.     The Contract between Cambron and Scale Social is void and unenforceable because it violates California's Talent Agencies Act (the "**TAA**"), which includes Sections 1700 through 1700.47 of the California Labor Code.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

COMPLAINT

18279933.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

52.     Under the Declaratory Judgment Act (28 U.S.C. § 2201), "any court of the United States, upon the filing of the appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

53.     Here, there is an actual case and controversy as to whether the TAA governs the Contract.

54.     The TAA regulates "artists" and "talent agencies," and is designed to protect artists in the entertainment industry from exploitation.

55.     The TAA defines a "talent agency" as follows:

[A] person or corporation who engages in the occupation of procuring, offering, promising, or attempting to procure employment or engagements for an artist or artists, except that the activities of procuring, offering, or promising to procure recording contracts for an artist or artists shall not of itself subject a person or corporation to regulation and licensing under this chapter. Talent agencies may, in addition, counsel or direct artists in the development of their professional careers.

§ 1700.4(a).

56.     Section 1700 of the TAA defines "person" as "any individual, company, society, firm, partnership, association, corporation, limited liability company, manager, or their agents or employees."

57.     The TAA defines "artists" as follows:

[A]ctors and actresses rendering services on the legitimate stage and in the production of motion pictures, radio artists, musical artists, musical organizations, directors of legitimate stage, motion picture and radio productions, musical directors, writers, cinematographers, composers, lyricists, arrangers, models, and other artists and persons rendering professional services in motion picture, theatrical, radio, television and other entertainment enterprises.

11

COMPLAINT

§ 1700.4(b).

58.     Scale Social is, and at all relevant times acted as, a talent agency under the TAA.

59.     Cambron is an artist under the TAA.

60.     For a person to carry on and conduct business as a talent agency, the TAA requires the person to procure a license from the California Labor Commissioner.

61.     Defendants did not procure a license from the California Labor Commissioner and are not licensed as a talent agency under the TAA.

62.     Defendants conducted their business with Cambron under the Contract as a talent agency despite not procuring the requisite license under the TAA.

63.     The Contract did not comply with the TAA's requirements for an agreement between a talent agency and an artist.

64.     Section 1700.23 of the TAA requires that "[e]very talent agency shall submit to the Labor Commissioner a form or forms of contract to be utilized by such talent agency in entering into written contracts with artists for the employment of the services of such talent agency by such artists, and secure approval of the Labor Commissioner thereof." Defendants did not comply with this section of the TAA.

65.     Section 1700.23 of the TAA further requires each form contract used by the talent agency to "contain an agreement by the talent agency to refer any controversy between the artist and the talent agency relation to the terms of the

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

COMPLAINT

18279933.

contract to the Labor Commissioner for adjustment." Section 1700.23 further requires that "[t]here shall be printed on the face of the contract in prominent type the following: 'This talent agency is licensed by the Labor Commissioner of the State of California.'" Defendants did not comply with these requirements as the Contract between Cambron and Scale Social does not contain any of the foregoing language.

66.     Defendants are not bonded as required under Section 1700.15 of the TAA.

67.     Defendants did not comply with Section 1700.25 of the TAA, which requires Defendants to deposit all funds received on behalf of an artist in a trust fund account. Instead, Defendants used an ordinary business bank account to hold funds received on behalf of Cambron.

68.     Defendants did not comply with Section 1700.24 of the TAA because they did not file with the Labor Commissioner a schedule of fees to be charged and collected in the conduct of their occupation, nor did Defendants keep a copy of the schedule posted in their office.

69.     Defendants consistently procured, offered, promised, and/or attempted to procure employment or engagements for Cambron.

70.     Defendants posted Cambron's content to the New Account.

71.     Gramajo's orchestration of and participation in the photo shoots, and his later posting and use of the photos, as well as any other content created by or with Cambron, constitutes the procurement of engagements for Cambron.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA  92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

72.     Defendants' requests to Cambron to create content for Gramajo's accounts, the New Account, and the other Creators' accounts constitute an offer and the attempted procurement of engagements for Cambron.

73.     Gramajo both procured and attempted to procure engagements for Cambron by tagging himself in content created and posted by Cambron.

74.     The Contract must be declared null and void from inception because Defendants were not licensed under or followed the requirements outlined in the TAA.

### SECOND CLAIM FOR RELIEF

### Promissory Fraud

75.     Cambron hereby incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

76.     Defendants never intended to perform their obligations under the Contract.

77.     The Contract was just a vessel that Defendants used as a front to gain control over and take advantage of Cambron and her accounts.

78.     Defendants failed to disclose, and/or Defendants concealed the fact that they were not a licensed talent agency.

79.     Defendants made numerous false and misleading statements to Cambron to procure her as a client, as described above, and Defendants knew said statements were false and misleading.

14
COMPLAINT

80.     Additionally, Gramajo falsely represented his position to Cambron. When Gramajo first approached Cambron, Gramajo represented that he could provide her with the services of a different management agency called Bluresca. So, when Cambron ultimately signed the Contract, she did so under the false pretenses that she would be receiving the services offered by, and would be working with, Bluresca, not Scale Social. In doing so, Gramajo used Bluresca's name, financial performances, and work product to convince her to sign a contract with Scale Social, not Bluresca.

81.     Defendants intended for Cambron to rely on Defendants' false and misleading claims to procure her as a client and to execute the Contract.

82.     Cambron justifiably relied on Defendants' false and misleading statements and executed the Contract.

83.     Cambron suffered damages as a result of Defendants' false and misleading statements and her justifiable reliance thereon.

84.     In defrauding Cambron, Defendants acted with malice, oppression, and fraud. From inception, Defendants intended to deceive Cambron.

## THIRD CLAIM FOR RELIEF

### Violation of California Civil Code Section 3344

85.     Cambron hereby incorporates by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

86.     Gramajo uses his social media accounts, including his Instagram account, as a means to obtain and procure business.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA  92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

COMPLAINT

18279933.

87.    To date, Gramajo has photos of Cambron posted on his social media accounts, including his Instagram, which are viewable to the public.

88.    Gramajo uses the photos of Cambron on his social media accounts to represent to other Creators and potential Creators that he manages Cambron in an effort to do business with those other Creators. For example, in one instance, Gramajo specifically referred two other Creators to view the photos of Cambron on his Instagram to convince the Creators to sign with Scale Social.

89.    Cambron is a successful and well-known Creator and social media influencer. The photos of Cambron contained on Gramajo's social media accounts falsely imply that Gramajo manages Cambron. Gramajo uses Cambron's name and reputation to lure in other Creators to do business with Defendants.

90.    Gramajo does not have Cambron's permission to use the photos of Cambron on any of his social media accounts.

91.    Cambron demanded that Gramajo remove all content of hers displayed on his social media accounts. Gramajo has not complied with said demands.

92.    Gramajo falsely, and without Cambron's consent, tagged himself in content created and posted by Cambron that he was not in, thereby procuring and attempting to procure new clients and additional revenue for him. Gramajo did not have permission to tag himself in any videos posted by Cambron.

93.    Gramajo knows that he is still using photos and videos of Cambron for commercial purposes without her permission.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA  92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

COMPLAINT
18279933.

94.    Cambron did not consent to Defendants using any content created by or with her for social media or otherwise.

95.    Cambron has suffered injury because of Gramajo's use of photos and videos that include her, including, among other things, lost revenue as Gramajo's use of Cambron's photos drives online traffic, including Fans and other Creators to him and his accounts instead of Cambron accounts.

96.    Under California Civil Code Section 3344, Cambron is entitled to recover her attorneys' fees and costs related to this claim.

## FOURTH CLAIM FOR RELIEF

### Commercial Misappropriation

97.    Cambron hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

98.    Defendants knowingly and intentionally used and continue to use Cambron's identity and appropriate her name and likeness to Defendants' commercial advantage without Cambron's consent, injuring her in an amount yet to be determined.

## FIFTH CLAIM FOR RELIEF

### Unfair Business Practices in Violation of California's Business and Professions Code Section 17200 et seq.

99.    Cambron hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

100.    California's Business and Professions Code Section 17200 et seq. (the Unfair Competition Law ("UCL")) prohibits any unlawful, unfair, or fraudulent business act or practice.

101.    On or about February 14, 2023, Defendants issued a form 1099-NEC to Autumn for $58,137.60 for 2022; however, Defendant only paid Cambron $57,633.60 in 2022. Thus, Defendants illegally issued the 1099 because it exceeded the amount actually paid Cambron.

102.    On December 31, 2022, Gramajo sent Cambron $3,500 as a housewarming gift. Cambron offered to send it back, but Gramajo responded by text message stating: "Enjoy it :) I don't want the money back sillyyy." However, in April 2023, Defendants issued Cambron another form 1099-NEC for the $3,500, which was illegally issued because the money was a gift.

103.    Defendants violated the UCL by engaging in unlawful, unfair, and fraudulent business acts and practices including, but not limited to: (a) knowingly and intentionally issuing a form 1099-NEC to Cambron for an amount greater than what Defendants paid Cambron; (b) knowingly and intentionally issuing a from 1099-NEC to Cambron for money sent to Cambron by Gramajo as a gift; (c) making false, misleading, and deceptive statements and representations to Cambron to solicit her to engage in business with Defendants and sign the Contract; (d) requiring Cambron to perform work for which she was not compensated for, including, but not limited to, recruiting and/or attempting to recruit other Creators; (e) locking Cambron out of the

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA  92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

New Account by creating a fraudulent email on behalf of Cambron, linking Gramajo's bank account to the New Account, refusing to give Cambron the login information to the New Account, and fraudulently using Cambron's identity to set up and control the New Account.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Autumn Cambron respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

A.     Declare the Contract between Defendants and Cambron null and void;

B.     Compensatory damages in an amount in excess of $75,000 to be proven at trial;

C.     Punitive damages;

D.     Pre- and post-judgment interest on any amounts awarded;

E.     Reasonable attorneys' fees and costs under California Civil Code Section 3344; and

F.     Any such other or further relief this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 31, 2024              Respectfully submitted:

                                      HAHN LOESER & PARKS LLP

18279933.

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

1

2

3            By:    s/ Jenny L. Dixon

4                        Jenny L. Dixon

5

6            Channing Blair Hesse (*pro hac vice forthcoming*)

7            Spencer Lee Davidson (*pro hac vice forthcoming*)
             GROGAN HESSE & UDITSKY, P.C.
8

9

10           Attorneys for Plaintiff Autumn Cambron

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hahn Loeser & Parks, LLP
One America Plaza
600 W. Broadway, Suite 1500
San Diego, CA 92101
Tel: (619) 810-4300 · Fax: (619) 810-4301

COMPLAINT

18279933.

# EXHIBIT A

DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

# MARKETING AGREEMENT

This Marketing Agreement (this "Agreement"), dated as of 9/10/2022_____ (the "Effective Date"), is between Scale Social INC , located at 1604 Pacific Beach Dr. San Diego, CA 92109 (the "Company") and Autumn Cambron_____, an individual with an email of ████████████ , phone number of ████████████ , and address of autumn cambron_____ (the "Client"). The Company and Client are sometimes individually referred to as "Party" and collectively referred to as the "Parties".

WHEREAS, Client desires to engage Company to be their exclusive OnlyFans, and all other subscription sites ("Subscription Sites") profile marketer throughout the world.

Client's OnlyFans Username: Company will issue a Company owned OnlyFans account mentioned below at the Signature Page as "Company Owned OnlyFans Page" and is subject to change at the sole discretion of the Company.

WHEREAS, Company accepts such engagement and agrees to manage the marketing efforts in association with Client's Subscription Sites account.

NOW THEREFORE, in consideration of the premises and mutual promises contained herein, and for other good and valuable consideration, the parties agrees to as follows:

I. TERM AND TERMINATION.

1.1. This Agreement will be effective upon the signing of this Agreement ("Effective Date") and will continue in effect for twenty four (24) months ("Term").

1.2. The Term will be renewed automatically at its expiration for an additional twenty four (24) months, unless one of the following events takes place:

1.2.1. This Agreement has been terminated pursuant to Section 4; or

1.2.2. Either party gives notice to the other party, not less than thirty (30) days before the expiration of the Term, of its intention not to renew the Term.

II. SERVICES AND WARRANTIES.

2.1. *Warranties*. Each party represents and warrants to the other that:



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

2.1.1 It has the full corporate right and authority to enter into this Agreement and to perform the acts required of it hereunder; and

2.1.2. The execution of this Agreement by such Party and the performance by such Party of its obligations and duties hereunder do not and shall not violate any other Agreement to which such Party is a Party or by which it is otherwise bound; and

2.1.3. When executed and delivered by such Party, this Agreement shall constitute the legal, valid and binding obligation of such Party, enforceable against such Party according to its terms; and

2.1.4. Such Party acknowledges that the other Party makes no representations, warranties or Agreements related to the subject matter hereof that are not expressly specified in this Agreement.

2.2. *Warranties of the Client.*  The Client represents and warrants to the other that:

2.2.1.  She is over the age of eighteen (18) years old; and

2.2.2. At all times during the duration of this Agreement and any renewal period, Client shall comply with any and all local, city, county, state, federal and International Laws, regulations and order now in effect or which may hereafter be enacted pertaining to or affecting to the content and posts posted by/for the Client, specifically including but not limited to nudity, indecent exposure, underage nudity, underage viewers of the content, sexual content, nude images, nude posts, pornography, obscenity.

2.3. *Company's Services.* Company's services include providing OnlyFans Page growth in terms of both subscribers and revenue, along with implementation of their Subscription Sites Strategy ("Services"). In order to grow the Client's following, the Company will pay pages with a large amount of followers to give a shout out to the Client. Company manages all content on the OnlyFans Page.

2.4. *Client's Responsibilities.* Client shall have only (1) Subscription Sites account (unless agreed to otherwise by both parties). Furthermore, Client shall (unless agreed to otherwise by both parties):

2.4.1. Upload content daily to the Company owned page for further uploading to Subscription Sites; and

2.4.2. Communicate effectively with Company's team in a timely manner; and



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

2.4.3. May not purposely lose any subscribers, or may not act in such a way prompting the loss of subscribers and must continue to act in an orderly manner in order to retain the newly acquired subscribers.

2.4.4. Under no circumstances is Client allowed to self-disable the OnlyFans page during the duration of this Agreement and any renewal Term unless otherwise stipulated in the Amendment by the Parties.

2.4.5. Client may not change the name of the OnlyFans Page during the duration of this Agreement and any renewal Term unless otherwise stipulated in the Amendment by the Parties. In case of Client's change of the login information to the OnlyFans page, Client shall be in breach of this Agreement and shall compensate the Company with Five Thousand ($5,000) Dollars, payable within Fourteen (14) days of the Breach.

2.4.6. Client shall be in direct violation of this Agreement if Client promotes any Subscription Sites and/or Social Media Accounts throughout the world not listed in this Agreement unless a written consent has been obtained from the Company.

2.4.7. Client may not open new and/or additionalOnlyFans accounts or other Subscription Sites without the written consent of the Company. If Client opens a new and/or additional Instagram, OnlyFans account or other Subscription Sites without the written consent of the Company, Client shall be considered in breach of this Agreement, and shall compensate the Company in accordance with Section 3.1. for all new accounts plus the account associated with this Agreement.

2.4.8. Under no circumstances is Client allowed to alter the Account Privacy settings during the duration of this Agreement and any Renewal Term unless otherwise stipulated in the Amendment by the Parties.

## III. COMPENSATION

3.1. *Compensation.* For the services provided by the Company pursuant to Paragraph 2.3 of this Agreement, Company receives Sixty (60%) Percent of Client's net profits from Subscription Sites, including the company owned OnlyFans Page, and any other social media commencing on the date of this Agreement, continued through any Renewal Terms and ending on the expiration of this Agreement.



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

3.1.1. *Definition of Net Profits.* Net Profits shall mean the total amount of profits collected after the deduction of the Subscription Site's fees.

3.1.2. *Accounting.* Company shall have unrestricted access to the Subscription Sites, OnlyFans Page, and all other social media accounts in order to accurately calculate weekly earnings. Company receives all payments made to Client in connection with Subscription Sites, OnlyFans Page, and any other social media. Company will retain from Net Profits as set forth in Section 3.1 and make payment of the remaining portion of income to Client on a monthly basis as set forth in Section 3.2.

3.1.3. In course of the duration of this Agreement and any renewal Term, if Client chooses to change their username and/or password on the Subscription Sites associated with this Agreement barring the Company from entering the above mentioned Subscription Site, Client shall be considered in material breach of this Agreement.

3.2. *Commission Payments.*

3.2.1. In course of the duration of this Agreement and any Renewal Term, Company receives all payments made to Client in connection with Subscription Sites, OnlyFans Page, and any other social media, retains from Net Profits Company's compensation set forth in Section 3.1 and makes payment of the remaining portion of income to Client on a monthly basis, unless otherwise stipulated.

3.3. *Failure to receive Payment.* If Client interferes in any manner with the Company's rights to receive payments from Subscription Site, Company shall have the right among other things to freeze Client's OnlyFans page and other Subscription Sites associated with this Agreement and pause all promotion for Client.

## IV. TERMINATION.

4.1. *Termination.* Company reserves the right to terminate this Agreement upon twenty (20) days written notice. If Client fails to properly fulfill her obligations under this Agreement, Company may terminate this Agreement imminently. If Client believes that the Company is in breach of this Agreement, Client must give a written Notice to the Company stating the alleged breach. Company shall have thirty (30) days after the receipt



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

of such notice to amend the alleged breach. If the alleged breach is not amended at the
expiration of the thirty (30) days after the receipt of such notice, Client may terminate this
Agreement with sixty (60) days notice to the Company.

4.2. *Compensation After Termination.*  If Client terminates this Agreement during the
Term, then Company shall be entitled for compensation due under Section 3.1 until the end
of the Term. Until the Term has fully expired, Client may not open another OnlyFans
Account or Subscription Sites without the written consent of the Company. If Client opens
new and/or additional OnlyFans account or Subscription Sites after termination and/or
without the written consent of the Company, Client will owe Company compensation in
accordance with Section 3.1. for all new accounts plus the account associated with this
Agreement.

4.3. *OnlyFans, and other Subscription Sites Accounts.*  Upon the termination and/or
expiration of this Agreement for whatever reason, the OnlyFans Page, Social media
accounts, and other Subscription Sites Accounts shall be owned by the Company

## V. INDEPENDENT CONTRACTOR.

5.1. This Agreement is made with the understanding that Company is an Independent
Contractor and not an employee of the Client and the Company will at all times act as an
Independent Contractor in performing services pursuant to this Agreement. Further, the
Company is not an agent, representative or partner of the Client. Neither Party shall have
any right, power or authority to enter into any agreement for or on behalf of, or incur any
obligations or liability of, or to otherwise bind, the other Party. This Agreement shall not
be interpreted or construed to create an association, joint venture, partnership, franchise,
sales, representative or employment relationship between the Parties or to impose any
partnership obligation or liability upon either Party, or the relationship of employer and
employee between the Client and the Company.

## VI. TAXES.

6.1. Both parties will be solely responsible for paying all federal, state, and local income
and self-employment taxes, penalties and interests, as well as timely and correctly



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

reporting and paying all taxes. Compensation paid pursuant to this Agreement shall not subject to the customary withholding of income taxes and employment taxes.

### VII. EXPENSES.

7.1. Both parties shall be responsible for their own expenses, unless specifically stated otherwise in this Agreement.

### VIII. AUTONOMY.

8.1. Except as otherwise provided in this Agreement, the Company will have full control over working time, methods, and decision making in relation to provisions of the Services in accordance with the Agreement. The Company will work autonomously and not at the direction of the Client. Except as expressly provided in this Agreement, Client will not have the right to direct, control, or supervise the Company, including (1) the manner in which Company performs or accomplishes its duties under this Agreement; (2) the details of how Company's services are to be accomplished; (3) the order of sequence in which tasks should be performed; (4) Rights to display the media from events executed by Company.

### IX. SOCIAL MEDIA POSTS BY CLIENT.

9.1. Client shall be solely responsible for its own content and the consequences of posting or publishing the same on any and all social media. In connection with each of Client's engagements managed by Company, Client affirms, represents, and/or warrants that (1) Client owns or has the necessary licenses, rights, consent, and permissions for the content being posted, (2) Client will not submit material that is copyrighted, protected by trade secret or otherwise subject to third proprietary rights, (3) publish falsehoods or misrepresentation that could damage Company or any third party Company, (4) falsely state or otherwise misrepresent its affiliation with a person or entity; (5) submit material that is unlawful, defamatory, libelous, threatening, harassing, ethically offensive, hateful, racially or ethnically offensive, or encourage conduct that would be considered a criminal offense, give rise to civil liability, violate any local, provincial, national, or international law, or is otherwise inappropriate.



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

## X. FOLLOWERS AND VIEWERS OF CLIENT; CONTENT.

10.1. The Client specifically understands and consents that the Client is fully responsible for the quality and age of the Client's followers and viewers. Further, Company shall not be responsible if Client's content is leaked on the Internet. Furthermore, the Company shall hold no liability in connection with any harassment that the Client may endure in any manner, at any point.

## XI. INDEMNIFICATION.

11.1. Except to the extent paid in settlement from any applicable insurance policies, and to the extent permitted by applicable law, Client agrees to indemnify and hold harmless the Company, and its respective affiliates, officers, agents, employees, and permitted successors and assigns against any and all claims, losses, damages, liabilities, penalties, punitive damages, expenses, reasonable legal fees and costs of any kind or amount whatsoever, which result from or arise out of any act or omission of the indemnifying party, its respective affiliates, officers, agents, employees and permitted successors and assigns that occurs in connection with this Agreement. This indemnification will survive the termination of this Agreement.

## XII. LIMITATION OF LIABILITY.

12.1. The parties agree that in no event shall Company be liable for any indirect, incidental, special, exemplary, consequential, punitive, or other indirect damages of any nature, for any reason, including, without limitation the breach of this Agreement or any expiration or termination of this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability) or otherwise, even if it has been advised of the possibility of such damages.

## XIII. PERFORMANCE.

13.1. The Parties agree to do everything necessary to ensure that the terms of this Agreement take effect.

## XIV. MODIFICATION OF AGREEMENT.

14.1. Any amendment or modification of this Agreement or additional obligation assumed by either Party in connection with this Agreement will only be binding if



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

evidenced in writing signed by each Party or an authorized representative of each Party.

## XV. NOTICES.

15.1. Any notice under this Agreement required to be sent, shall be in writing and shall
be sent by registered or certified mail to the last address of the party to whom the notice
is to be given, as designated by such party in writing. Parties hereby designate their
addresses as first stated above unless either party instructs the other one that their address
for notices has changed in writing.

## XVI. WAIVER.

16.1. The waiver by either Party of a breach, default, delay or omission of any of the
provisions of this Agreement by the other Party will not be construed as a waiver of any
subsequent breach of the same or other provisions.

## XVII. TITLES/HEADINGS.

17.1. The Section and paragraph headings appearing in this Agreement are inserted only
as a matter of convenience and in no way define, govern, limit, modify or construe the
scope or extent of the provisions of this Agreement to which they may relate. Such
headings are not part of this Agreement and shall not be given any legal effect.

## XVIII. DISPUTES.

18.1. *Arbitration.* A cause of action arising out of this Agreement includes any cause of
action seeking to enforce any provision of or based on any matter arising out of or in
connection with this Agreement or the transactions contemplated by it. The parties agree
to settle any dispute, action, or proceeding, whether in contract, tort, or otherwise, arising
out of this Agreement first via mediation, and if such mediation is unsuccessful, the
parties agree to binding arbitration according to the then-prevailing procedures as set
forth by the American Arbitration Association, with the venue taking place in San Diego,
CA.

18.2. *Legal Counsel.* Each party acknowledges that it has read and understood this
Agreement in its entirety and signs this Agreement voluntarily, free from duress and
having had the opportunity to seek independent legal advice on the matters contained



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

herein.

*18.3. Attorneys' Fees.* If any party to this Agreement institutes any legal cause of action—including mediation and arbitration—against the other Party arising out of or relating to this Agreement, the prevailing party. will be entitled to an award of the costs incurred in conducting the cause of action, including reasonable attorneys' fees and expenses, among others.

18.4. *Breach; Liquidated Damages.* Talent agrees that it would be impossible or inadequate to measure and calculate Company 's damages due to Talent's breach of the covenants as set forth herein. Accordingly, Talent agrees that if it breaches any of the aforementioned Sections, in lieu of actual damages, and upon each Occurrence (defined below) of a breach of any such Section, Talent agrees that Company may recover liquidated damages from Talent in the amount of $20,000 USD ("Liquidated Damages"), with interest accruing at the rate of ten percent 10% per annum, compounding annually from the date of each breach of this Agreement. For purposes of this section, an Occurrence shall include, without limitation, any transmittal of Confidential Information without limitation to any person, entity or enterprise in any medium or fashion other than as permitted herein, any Publicity of the existence of Confidential Information, any disparagement of Company or its affiliates, or the attempt to misappropriate the intellectual property of the Company. In the event Company declines to exercise the Liquidated Damages clause herein, Company may pursue damages as allowed for under applicable law.

18.5. *Equitable Remedies.* Each party acknowledges that its breach or threatened breach of any of its obligations under this Agreement would give rise to irreparable harm to the other parties and monetary damages would not be an adequate remedy. Therefore, each party agrees that if either party breaches or threatens to breach any of its obligations, the other party to this Agreement will be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other equitable relief available from a court of competent jurisdiction (without any requirement to post bond).

## XIX. GOVERNING LAW.

19.1. This Agreement will be governed by and construed in accordance with the laws of the State of California. All legal actions relating to this Agreement shall be brought in the



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

state or federal courts located in the State of California. Each party knowingly and
voluntarily agrees to San Diego, California as the venue for any such action, suit, or
proceeding.

## XX. SEVERABILITY.

20.1. In the event that any of the provisions of this Agreement are held to be invalid or
unenforceable in whole or in party, all other provisions will nevertheless continue to be
valid and enforceable with the invalid or unenforceable parts severed from the remainder
of this Agreement.

## XXI. EXCLUSIVITY.

21.1. The Client herein appoints the Company to act as the Client's exclusive
Subscription Sites profile marketer throughout the World, during the Term and all
renewal terms, in all markets necessary to effectively provide social medical exposure
and growth. The Client herein acknowledges that this Agreement is an exclusive
arrangement with the Company. The Client further acknowledges that during the time of
this Agreement and all renewal terms, Client may not enter into any other agreements of
any sort with a third party in connection to the current and any new/additional
Subscription Sites.

## XXII. NON-DISCLOSURE.

22.1. During the Term and for a period of twenty-four (24) months thereafter, Client shall
keep strictly confidential and shall not disclose, cause or permit to be disclosed, to any
person or entity any information about this Agreement herein except to those officers,
employees or other authorized agents and representatives of Client whom disclosure is
reasonably necessary in connection to the terms of this Agreement and who shall agree to
be bound by the terms of this Agreement, and except as otherwise consented to in writing
by the Company. Client shall take all actions reasonably necessary to ensure that the
contents of this Agreement remains strictly confidential and not disclosed to or seen, used
or obtained by any person or entity except in accordance with the terms of this
Agreement.



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

## XXIII. NON-SOLICITATION.

23.1. During the Term and for a period of twenty-four (24) months thereafter, Client shall not, directly or indirectly, solicit or attempt to solicit any business from Company's clients, prospective clients, business contacts or vendors.

## XXIV. NO INTERFERENCE.

24.1. Client shall not, either during or after the Term, contact or interfere with the business or affairs of Company's customers, prospective customers, clients, potential clients or suppliers (or the owners, employees, or agents of any of them.)

## XXV. NO DISPARAGEMENT.

25.1. Client shall not, either during or after the Term, make any statements, whether oral or in writing, that would tend to disparage or defame the Company, or their employees.

## XXVI. SURVIVAL.

26.1. The provisions of this Agreement will survive the termination of the Term, regardless of the cause for termination.

**IN WITNESS WHEREOF,** each of the Parties herein have caused this Agreement to be signed and delivered by its duty authorized representative.



DocuSign Envelope ID: FECCB4FA-E1A2-4727-83BD-FE68881E1E42

| COMPANY | CLIENT |
|---|---|
| Signature: _Ralph Gramajo_ | Signature: _[signature]_ |
| Name: Ralph Gramajo | Name: Autumn Cambron |
| Date: 9/10/2022 | Date: 9/11/2022 |

**COMPANY OWNED ONLYFANS PAGE:**

www.onlyfans.com/ autumnxrenn